THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* DIMAS PÉREZ SOTO, Defendant and Appellant.

No. 15859.   Argued March 1, 1955.—Decided June 26, 1956.

Santos P. Amadeo, José E. Cabrera Rivera and Manuel A. Barreto Barrios for appellant. José Trías Monge, Attorney General, and Rafael L. Ydrach Yordán, Fiscal of the Supreme Court, for appellee.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

The evidence for the prosecution in this case presents two irreconcilable versions as to the way the accident occurred. Witness Carmelo Rodríguez Valle, who was driving a truck from Arecibo to San Juan, testified that at his left in front of him and in the same direction he was going, a boy was walking, along the footpath, two or three feet away from the road; that a Ford driven by the defendant was coming from San Juan to Arecibo; that when the vehicles met he heard a clash and stopped his truck a short distance away; that when he looked, the car had already run over the boy; that as he dismounted from the truck he saw the boy lying dead on the road; that "the car might have been going over 60 miles"; that when the boy received the blow "he was outside the road about three feet from the road"; that he saw the accident through the mirror when he heard defendant applying the brakes (Tr. Ev. 9–19).

Witness Augusto Molina, an insular policeman who arrived later at the scene of the accident, testified that the defendant told him at the same place of the accident, that he was not going at an excessive speed, that the boy was standing on the grass of the footpath; that as he passed near the place where the boy was standing, the latter tried to scare

a horse away, that the horse "made a motion as if to neigh and when the boy tried to run away from it he then hit him with the front right side of the car"; "that everything took place rapidly, that the boy was on the edge of the road when he passed him and that it all happened suddenly" (Tr. Ev. 30–31).

The third and last witness for the prosecution was Hon. Joaquín Correa Suárez, Superior Judge of Puerto Rico, who testified that as he finished his work in the court, he went towards San Juan and came across an accident and saw "a youngster lying across the highway," a truck going in the same direction he was going (from Arecibo to San Juan) somewhat ahead of him, and a car that was coming from Manatí to Arecibo; that the truck started to reduce its speed with the intention of stopping and he motioned him to stop; that the driver of the other vehicle stopped at about 20 or 25 feet from where the boy's body was lying, got out of the car and with an exclamation of surprise said "My God, what is this"; that the driver admitted that his car had hit the boy; that "the boy was lying crosswise, perpendicular to the center line of the highway, towards my left, going from Arecibo towards San Juan"; that he measured the distance with his feet, with the shoes, from where the first pieces of glass were found; that he then noticed that the pieces came from "the glass on the right-hand side of the car driven by defendant"; that they also measured "the place where some papers and pennies were found [it seems that the boy was carrying that money] and there was a distance of about 60 to 70 feet measured by my shoes"; that from the place where the boy was lying to where defendant's car stopped there was a distance of approximately 20 to 22 feet; that pieces of glass were found for a distance of about 60 feet (steps?) and then 20 feet from where the boy was lying to where the car stopped, 80 feet from the first impact to where the car stopped; that he asked the truck driver how the accident had happened, if he had seen anything, and the driver told him

"that he had not seen how the accident occurred"; that the witness saw a horse near the place of the occurrence, "eating grass from the ditch, where, according to the driver, the youngster was walking; that the distance from where the first pieces of glass were found to where the boy was lying was approximately from 8 to 10 feet more than from here (witness' stand) to the other wall (back of the court-room?); that the distance from where the boy's body was lying to where the defendant's car stopped was "about from here [witness' stand] to where the defendant is", (end of the court rail?); that "apparently the boy was crossing the military highway when he was hit"; that the pieces of glass were stuck in the pavement, "most of them might have been about one and one half to two and a half feet away from the footpath, away from the outer edge of the highway" (Tr. Ev. 21–28).

There is no doubt that the version of the accident as presented by witness Carmelo Rodríguez Valle is confusing and improbable. Furthermore, the very words of the trial judge show that, contrary to what appellant alleges, he did not give credit to the witness' testimony. In pronouncing judgment the trial judge stated the following:

"The court believes that in this case the evidence taken as a whole shows that the defendant is guilty of gross negligence, criminal negligence. Although it is true that there was a horse, as shown by the evidence, he knew that the boy was walking on the footpath and that fact alone is sufficient warning for the defendant as soon as he saw him, to start taking precautions to reduce his speed. The car, *undoubtedly, was being driven at an excessive speed* inasmuch as from the place where the first pieces of glass were found to where it stopped there was a distance of about 60 feet. Sixty feet from where the body was lying and 20 feet beyond that. If that car had been going moderately it could have avoided the accident and stopped sooner. The fact that *it stopped so far away clearly shows that it was going at an excessive speed.* The fact that the boy, according to the witness, was hurled to the center of the road at about 2 feet from the curb *shows that the car hit*

*him hard because it was going at an excessive speed.* The court believes that the evidence is sufficient and finds him guilty of involuntary manslaughter." (Tr. Ev. 32–33.)

Therefore, in order to decide this case we will regard as true defendant's version, corroborated by Judge Correa Suárez, who immediately examined the scene of the accident: that on that day the defendant was driving an automobile from San Juan to Arecibo; that in the opposite direction a boy about 14 years old was walking along the footpath; that there was a horse in the ditch of the footpath; that when the boy passed near the horse it whinnied, the boy became scared and tried to cross the highway at the moment the defendant was passing, close to the right side of the boy; that defendant's car hit him with the right front headlight and hurled him to the center of the road at about 60 steps from the point where the car had hit him.

██ The trial judge based his judgment of conviction on the fact that the defendant was going at an excessive speed, and he deduced the excessive speed from the proven fact that the boy's body was hurled 60 feet away from the point where the car hit him. The evidence does not show whether the car dragged or "pinned" the boy before running over him, although both the oral evidence and the autopsy tended to reveal that at some time the automobile ran over the boy's body at some point between the hemithorax, the abdomen, and the thighs.

In order to determine criminal negligence as to excessive speed, the statute in point is § 15 (a) of the Automobile Act of 1946 as amended by Act No. 156 of April 26, 1951 —9 L.P.R.A. 561, § 185—which provides: "The speed of a motor vehicle shall at all times be regulated with due care, and with due regard to the width, amount of traffic, use, and condition of the highway. No person shall drive at a speed higher than that which may permit him to exercise due control of the vehicle and to reduce the speed, or to stop when necessary in order to avoid knocking down a person or

to collide with any other vehicle or transportation device on the road or entering same, in compliance with the requirements of law and with the duty of exercising the due care to which drivers and other persons using the road are subject" and § 17(o) of the same Automobile Act of 1946 —9 L.P.R.A. 565, § 187—which provides: "The Secretary [of Public Works] is hereby authorized to prescribe additional rules regulating traffic on the public highways. . . . Said rules, when promulgated, shall have the force of law." It is significant that the amendment to § 15 in 1951 eliminates the former provision which provided that: "It shall be deemed *prima facie* evidence that a vehicle is driven at an unreasonable speed and against the provisions of the preceding clause (a), if said vehicle is operated .. . . in all other cases, at a speed of more than forty-five (45) miles an hour," (referring to rural zones or public highways). The parties have not produced nor have we been able to find any regulation of the Secretary of Public Works concerning traffic on the public highways which, after promulgation, may have the force of law. Therefore, we must conclude that the only provision regulating traffic on public highways in Puerto Rico since 1951, and which is applicable to this case, is the general provision of the above-copied § 15(a).

An examination of the state of law prevailing at the time of the accident clearly discloses that the speed limit at which a vehicle should be driven is determined by the following factors (1) the width of the road; (2) the amount of traffic; (3) the use to which the road or public highway is devoted; (4) the conditions of the road or highway. As to the "due care" imposed on the driver by the tutorial power of the state in connection with the speed at which he should drive the vehicle, it is clear that the judicial inquiry must cover the following aspects: (1) whether the possible offender had proper control of the vehicle he was driving, and (2) whether by reducing the speed or stopping the vehicle, the possible offender might had avoided knocking down

a person or colliding with any other vehicle or transportation device *on the road* or entering the same.

The evidence here established that it was a "wide and straight" road, (Tr. Ev. 12) ; that except for the truck going from Arecibo to San Juan and the automobile driven by the defendant going from San Juan to Arecibo, there were no other vehicles on the road at the time of the accident, (Tr. Ev. 12 and 19) ; that it was a public road known as the "Military Road" (Tr. Ev. 12) ; that the road had a space for pedestrians to travel, a "footpath" beyond the edge of the road and pavement (Tr. Ev. 10, 15, 26, 27) ; that the road "was dry" (Tr. Ev. 13) ; that the accident took place at quarter to six in the afternoon, when "the sun was still high" (Tr. Ev. 16).

In the light of these facts it is difficult to determine at what point the speed at which defendant was driving his vehicle in this case becomes criminal negligence per se, especially where there is no maximum speed provided by law or by a regulation having the force of law. As a matter of fact, the defendant met a truck coming in the opposite direction, without any mishap.

As to whether the defendant had proper control of the vehicle he was driving and could have reduced his speed or stopped the vehicle in order to avoid knocking down a person, there is no showing in the evidence that the defendant drove the vehicle recklessly, or in any other way, from which carelessness or wantonness might be inferred. As a matter of fact, in front of him, *on the road,* there was no other person, vehicle or transportation device, except the truck which he met without any difficulty, that might induce him to reduce his speed or stop the vehicle in order to avoid knocking down a person. Nor was this an intersection or a school zone. The boy who was walking on the footpath, *outside the road,* was facing the vehicle driven by the defendant. The truck driver testified that when he heard the blow, caused when the boy struck the right front headlight of the automobile

driven by the defendant, he also heard defendant applying the brakes, "a smooth stop."

The way this accident occurred we do not believe that by reducing the speed, which defendant undoubtedly attempted to do at the very instant of the collision, defendant could have avoided the unfortunate accident. The simultaneousness of the passing of the automobile and the boy's crossing the road at the time of the collision made it altogether impossible to stop the vehicle and prevent the boy's death.

█ The only other evidence of incrimination is the stretch of road traveled by the automobile from the point where it collided with the boy. Judge Correa Suárez traced the pieces of glass left from the broken headlights and testified that there were 60 feet from the place of the collision to the place where the boy was lying. We agree that in accidents in urban zones, in accidents near a public school, in accidents near an intersection, or even in accidents in rural zones, if it is shown that at the time of the collision there was a certain amount of traffic on the road of persons or of certain mechanical devices, the fact that the automobile came to a stop 60 feet away from the place of the accident, would deserve a more serious consideration. See, for example, People v. Negrón (Per Curiam) ante, p. 279 (1956); People v. Piñeiro, 77 P.R.R. 502 (Sifre) (1954); People v. Andino, 78 P.R.R. 744 (Marrero) (1955); People v. López, 77 P.R.R. 573 (Sifre) (1954).

But the attendant circumstances in this case compel us to distinguish it from our other decisions concerning traffic accidents due to excessive speed. The abrupt way in which the boy darted out into the highway at the moment that the defendant's car was passing by him convinces us that this is an inevitable accident and not the result of criminal negligence.

The judgment of the Superior Court will be reversed and defendant acquitted.